FILED
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**May 9, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

JEFFREY HELVIE,

      Plaintiff - Appellant,

v.

CHAD JENKINS, in his individual and
official capacities,

      Defendant - Appellee.

No. 22-1187

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:20-CV-02521-STV)**

_____

Sean Michael McDermott, McDermott Stuart & Ward LLP, Denver, Colorado, for
Appellant Jeffrey Helvie.

Michael A. Sink (Kerri A. Booth with him on the brief), Assistant County Attorneys,
Adams County Attorney's Office, Brighton, Colorado, for Appellee Chad Jenkins.

_____

Before **TYMKOVICH**, **EBEL**, and **BACHARACH**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

      In this 42 U.S.C. § 1983 action, Plaintiff Jeffrey Helvie appeals the district

court's decision to grant Defendant Chad Jenkins, an Adams County, Colorado,

deputy sheriff, qualified immunity on Helvie's claim that the deputy used excessive force against Helvie during a traffic stop.  Having jurisdiction under 28 U.S.C. § 1291, we AFFIRM because Helvie has failed to show that Deputy Jenkins violated his constitutional rights and, necessarily flowing from that holding, Helvie has failed to show that his constitutional rights allegedly violated were clearly established.

## I. STANDARD OF REVIEW

The district court granted Deputy Jenkins qualified immunity at the summary judgment stage of this litigation.  We review that decision de novo, viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to Helvie, the non-moving party.  See Arnold v. City of Olathe, 35 F.4th 778, 788 (10th Cir. 2022).

A court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In the ordinary case, then, a plaintiff can survive summary judgment by establishing genuine issues of material fact that a jury must decide.  See Est. of Taylor v. Salt Lake City, 16 F.4th 744, 758 n.5 (10th Cir. 2021), cert. denied, 143 S. Ct. 83 (2022).  But when a defendant government official invokes qualified immunity, this court accepts as true the facts that the plaintiff can support with evidence and then asks whether the plaintiff has shown 1) that the defendant violated the plaintiff's federal rights, and 2) that the violation was clearly established at the time the incident at issue occurred.  Id. at 756–58 & 758 n.5.  Courts have discretion to decide "which of the two prongs of the qualified immunity

2

analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

## II. BACKGROUND

### A. Facts that the district court accepted as true

There is no audio or video recording of the incident at issue here. In considering Deputy Jenkins's summary judgment motion, the district court[1] accepted the following facts as true:

> On August 23, 2018, at approximately 11:45 p.m., Deputy Jenkins observed Plaintiff [Helvie] make several traffic infractions while driving a Nissan pickup truck. Specifically, Deputy Jenkins observed [Helvie] turn without using a signal; accelerate, slow down and then accelerate to speeds between 52 and 74 miles per hour [in a posted 50-mile-per-hour zone (Aplt. App. 49)]; and stop almost a truck's length past the line for a stop sign. Deputy Jenkins activated his overhead lights, and [Helvie] pulled over his vehicle. Besides [Helvie], two female passengers and a large black dog were inside the Nissan truck.

> According to [Helvie], his window was partially down when Deputy Jenkins approached [Helvie's] vehicle. According to Deputy Jenkins, he could smell the strong odor of burnt marijuana coming out of the window, though [Helvie] disputes having smoked marijuana that day. [Helvie] handed his driver's license and registration to Deputy Jenkins. [Helvie] had some difficulty providing his proof of insurance—which was on his phone—due to either poor cellular reception or [Helvie's] inability to correctly enter a passcode.

> Deputy Jenkins noticed what appeared to be ash on [Helvie's] lap.[2]

> N.2 Deputy Jenkins also maintains that he observed two marijuana bottles on the driver's side floorboard. [Helvie] has submitted an affidavit in which he claims that the

---

[1] The parties consented to a magistrate judge deciding this case. See 28 U.S.C. § 636(c).

marijuana bottles were under his car seat and thus not readily visible from outside the car. The Court will therefore treat Deputy Jenkins' observation of the marijuana bottles as a disputed fact and will not consider this fact for purposes of deciding the instant [summary judgment] motion.

According to [Helvie], Deputy Jenkins asked [Helvie] about the "white powder" in [Helvie's] lap and asked [Helvie] whether he had been drinking or smoking. [Helvie] maintains that he stated he did not need to answer Deputy Jenkins' questions. It is undisputed that [Helvie] then rolled up his window, which [Helvie] says he did because he was scared.

At this point, Deputy Jenkins opened the door of [Helvie's] vehicle. According to Deputy Jenkins, he believed that [Helvie] was operating a vehicle while under the influence and wanted to conduct further investigation. Deputy Jenkins asked [Helvie] to get out of the vehicle several times, but [Helvie] refused to comply. According to [Helvie], he did not get out of the vehicle because he observed Deputy Jenkins standing as if he had a gun or a taser, and [Helvie] was terrified.

When [Helvie] did not get out of the vehicle, Deputy Jenkins grabbed [Helvie's] arm and ordered him out of the vehicle. According to Deputy Jenkins, [Helvie] pulled away. Deputy Jenkins then grabbed [Helvie's] leg and pulled him out of the vehicle, causing [Helvie] to land on his back. <u>As Deputy Jenkins was pulling [Helvie] out of the vehicle, he observed a handgun in the pocket of the driver's side door.</u> [3]

> N.3   In an affidavit, [Helvie] states that Deputy Jenkins "must" have seen the firearm when he searched the truck after having already subdued [Helvie]. But, unlike with the marijuana bottles, [Helvie] does not dispute Deputy Jenkins' statement that the handgun was in the pocket of the driver's side door, and thus could have been visible to Deputy Jenkins as he was pulling [Helvie] out of the vehicle. And [Helvie] does not offer any evidence to contradict the statement in Deputy Jenkins' police report that he observed the firearm as he was pulling [Helvie] out of the vehicle. Thus, [Helvie's] conclusory and self-serving affidavit, which provides nothing more than a guess as to when Deputy Jenkins observed the firearm, does not create a genuine issue of material fact as to when Deputy Jenkins observed the firearm. <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1111 (10th Cir. 1991) (To create a genuine issue of material fact,

> "the nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.").

> Deputy Jenkins then dragged [Helvie] to the back of [Helvie's] vehicle, which Deputy Jenkins stated he needed to do in order to remove [Helvie] from close proximity to the gun.  According to [Helvie], Deputy Jenkins then dropped a knee into [Helvie's] chest, fracturing two of [Helvie's] ribs.

>     Eventually, Deputy Jenkins was able to handcuff [Helvie] and place [Helvie] in the patrol car.  Deputy Jenkins did not use any force on [Helvie] after he was fully restrained.  Deputy Jenkins searched [Helvie's] vehicle and found a loaded .45 caliber handgun, unsealed bottles of marijuana, and a glass pipe that had marijuana residue.  [Helvie] requested medical attention and Deputy Jenkins called for an ambulance. [Helvie] was taken to the hospital where he was treated and then medically cleared for transport to the Adams County Detention Facility.

(Aplt. App. 176–78 (record citations omitted, emphasis added).[2])  As we discuss below, Helvie disputes the fact that Deputy Jenkins saw the gun in the driver's door pocket while the deputy was pulling Helvie from his truck.  However, Helvie does not dispute the fact that there was a gun in the driver's door pocket that would have been visible to Deputy Jenkins as he was dragging Helvie from his vehicle out the driver's door.

Deputy Jenkins charged Helvie with nine criminal offenses, ranging from several traffic infractions to obstructing a police officer and resisting arrest to unlawfully possessing a firearm while intoxicated and operating a vehicle while

---

[2] See also Aplt. App. 154–74 (parties' combined statement of disputed and undisputed facts).

under the influence of marijuana.  Ultimately, Helvie pled guilty to speeding and the rest of the charges were dropped.

## B. Procedural posture

In the case before us, Helvie sued Deputy Jenkins under 42 U.S.C. § 1983, alleging the deputy used excessive force against Helvie in violation of his Fourth Amendment right to be free from unreasonable seizures.[3]  Following discovery, the district court granted Deputy Jenkins's motion for summary judgment based on qualified immunity.  The district court based its ruling only on the second qualified immunity inquiry, ruling that Helvie had failed to show that any constitutional violation Deputy Jenkins may have committed was clearly established.  Helvie appeals that decision.  We affirm, finding no constitutional violation and, flowing from that, there were no clearly established constitutional rights violated.

### III. LEGAL DISCUSSION

In affirming qualified immunity for Deputy Jenkins, we reject Helvie's assertion that the district court failed to view the evidence in the light most favorable to him because the court accepted as true the fact that Deputy Jenkins saw the gun in

---

[3] Although Helvie sued Deputy Jenkins in both his individual and official capacities, the district court, in granting Deputy Jenkins summary judgment, ruled that Helvie had abandoned any official-capacity claim.  Helvie does not challenge that ruling on appeal.  Furthermore, although Helvie asserted generally that he was suing Deputy Jenkins under both federal and Colorado law, Helvie specifically alleged only a federal claim under 42 U.S.C. § 1983.  And, although Helvie's complaint initially mentioned the violation of other constitutional rights, he has since limited his claim to alleging only a Fourth Amendment violation.

the driver's door pocket as he was pulling Helvie from his truck.  Accepting that fact

as true, we then turn to the two-pronged qualified immunity analysis.  We conclude

first that Helvie failed to establish that Deputy Jenkins violated Helvie's Fourth

Amendment rights; that is, Helvie failed to establish that the deputy used

unreasonable force against him during the traffic stop.  Necessarily resulting from

our constitutional ruling, we also conclude that the constitutional violation Helvie

alleges was not clearly established at the time of the incident in August 2018.

**A. The district court did not fail to view the evidence in the light most favorable to Helvie**

As an initial matter, Helvie contends that the district court erred by failing to

view the evidence and the inferences to be drawn therefrom in the light most

favorable to him, as it was required to do in considering Deputy Jenkins's summary

judgment motion.  See Arnold, 35 F.4th at 788.  Specifically, Helvie challenges the

district court's decision to accept as true the fact that Deputy Jenkins saw the firearm

in the pocket of the driver's door as the deputy was pulling Helvie from his truck.

The only direct evidence of when Deputy Jenkins saw the gun comes from the

deputy.  In both the incident report Deputy Jenkins completed soon after the traffic

stop and in his sworn deposition taken for this lawsuit, Deputy Jenkins asserted that

he saw the gun as he was pulling Helvie from his truck.  Helvie contends instead that

he has presented sufficient evidence from which a reasonable jury could find that the

deputy did not see the firearm until after he had arrested and handcuffed Helvie,

placed him in the patrol car, and then returned to search the truck.  The district court

rejected Helvie's contention because Helvie had no personal knowledge of when Deputy Jenkins saw the gun.  See generally Fed. R. Evid. 602 (stating that "[a] witness may testify only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter").  On the other hand, Deputy Jenkins presented facts establishing the plausibility that he observed the gun while dragging Helvie from the truck and he was consistent regarding this fact throughout.

Although it is clear that Helvie had no personal knowledge of when the deputy saw the gun in Helvie's driver's door pocket,

> [d]oubts as to the credibility of the [summary judgment] movant's affiants or witnesses may lead the court to conclude that a genuine issue of material fact exists. . . . "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 10A Fed. Practice & Proc. ("Wright & Miller"), § 2726 (4th ed. update April 2022) (footnotes omitted) (quoting Advisory Committee Note to 1963 amendment of Fed. R. Civ. P. 56).

Most relevant here,

> [a] similar problem involving credibility arises when the knowledge of the events or occurrences on which the action is based lies exclusively within the control of the party moving for summary judgment. . . . Courts have been reluctant to deprive the nonmoving party of the opportunity of testing the credibility of the movant or the movant's witnesses in open court in this context.  As explained by one commentator, "there is a justifiable judicial fear of the injustice which could result from judgment based on affidavits asserting facts that are, because of their nature, incapable of being effectively controverted."

Id. (footnotes omitted); see also Jaxon v. Circle K Corp., 773 F.2d 1138, 1140 n.2 (10th Cir. 1985); Weir v. Anaconda Co., 773 F.2d 1073, 1081–82 & 1082 n.8 (10th Cir. 1985).

Nonetheless, "[t]he general rule is that," at the summary judgment stage of litigation, the party challenging the credibility of a sworn statement "must" produce "specific facts . . . in order to put credibility in issue so as to preclude summary judgment.  Unsupported allegations that credibility is in issue will not suffice." Wright & Miller, 10A Fed. Practice & Proc. § 2726 (footnotes omitted); see also Prochaska v. Marcoux, 632 F.2d 848, 851 (10th Cir. 1980); Wood v. Handy & Harman Co., 318 F. App'x 602, 606–07 (10th Cir. 2008) (unpublished) (citing Supreme Court and published Tenth Circuit cases); Wright & Miller, 10B Fed. Practice & Proc. § 2730.

A party opposing summary judgment can rely on circumstantial evidence to challenge a sworn statement.  See Madison v. Deseret Livestock Co., 574 F.2d 1027, 1036 (10th Cir. 1978) (stating that "inferences from circumstantial facts . . . may on occasion even be strong enough to overcome the effect of direct testimony to the contrary" (citing Rutherford v. Am. Bank of Commerce, 565 F.2d 1162, 1164 (10th Cir. 1977))); see also Huff v. Reeves, 996 F.3d 1082, 1088–89 (10th Cir. 2021).

Here, however, Helvie did not proffer sufficient circumstantial evidence from which a reasonable jury could find that Deputy Jenkins's statements that he saw the gun in the driver's door pocket as he was pulling Helvie from the truck were not credible.  To dispute Deputy Jenkins's statements in the district court, Helvie relied

only on the assertion he made both during his own deposition and in a sworn affidavit that Deputy Jenkins never said anything about the gun while the deputy was pulling Helvie from his truck.

For the first time on appeal, Helvie makes this same argument again by also relying in part on the unsworn statement from Daniela Trott to challenge the credibility of Deputy Jenkins's statements about when he first saw the gun.  To give this statement some context, Trott and her teenage daughter were the two passengers in Helvie's truck when Deputy Jenkins stopped Helvie.  After Deputy Jenkins removed Helvie from his truck and placed the handcuffed Helvie in the deputy's patrol vehicle, Deputy Jenkins returned to Helvie's truck, removed Trott and her daughter from the vehicle and then searched it.  Later, during a telephone interview, Helvie's investigator asked Trott generally what happened during the traffic stop.  Helvie points out that "nowhere in [that] statement" does Daniela Trott indicate "that Deputy Jenkins observed, nor even asked about the firearm located in the pocket of the driver side door."  (Aplt. Br. 10.)  However, Trott's out-of-court statement was neither made under oath nor was it subject to cross-examination.

Generally we will not consider evidence that was not before the district court when it ruled on the summary judgment motion.  See Feichko v. Denver & Rio Grande W. RR. Co., 213 F.3d 586, 592 n.5 (10th Cir. 2000).  Here, although Trott's unsworn statement was before the district court, Helvie never relied on it before that court to challenge Deputy Jenkins's credibility.  Even considering Trott's unsworn statement, however, along with Helvie's affidavit and deposition testimony, this

circumstantial evidence indicated only that Deputy Jenkins never mentioned the gun during the arrest and its immediate aftermath.  That is not sufficient to create a triable issue as to the credibility of Deputy Jenkins's incident report and subsequent sworn testimony as to when he saw the gun.  There is nothing inconsistent between Deputy Jenkins observing the gun during the process of arresting Helvie but not mentioning that fact to the passengers in his truck after the arrest and after they were removed from the vehicle.  The district court, therefore, did not err in accepting as true the fact that Deputy Jenkins saw the firearm as he was pulling Helvie out of the truck.[4]

## B. Helvie failed to establish that Deputy Jenkins violated the Fourth Amendment by using unreasonable force against Helvie

Accepting, then, that Deputy Jenkins saw the firearm in Helvie's driver's door pocket at the time the deputy was pulling Helvie from his truck, we turn to the first qualified immunity inquiry, whether Helvie has shown that Deputy Jenkins violated the Fourth Amendment by using unreasonable force against Helvie.  We conclude

---

[4] In his appellate brief, Helvie also refers to a statement made by the other passenger in his truck, Daniela Trott's teenage daughter Jay.  But Jay's statement is not included in the appellant's appendix.  Nor does it appear to be included in any document on the district court's electronic docket.  Because it does not appear to have been before the district court, we will not consider it.  See Feichko, 213 F.3d at 592 n.5.  In any event, as described by Helvie in his appellate brief, Jay's statement, like Trott's, apparently indicated only that Deputy Jenkins never mentioned the gun in Helvie's driver's door pocket.

Helvie failed to make this showing. In explaining why, we set forth the relevant

Fourth Amendment law and then apply it to the facts of this case.[5]

### 1. Relevant Fourth Amendment law

#### a. <u>Graham v. Connor</u>

The Fourth Amendment protects against "unreasonable . . . seizures." We

apply the three non-exclusive <u>Graham</u> factors to assess the reasonableness of the

force an officer used to seize a person:

> Because "[t]he test of reasonableness under the Fourth Amendment
> is not capable of precise definition or mechanical application," <u>Bell v.</u>
> <u>Wolfish</u>, 441 U.S. 520, 559 (1979), . . . its proper application requires
> careful attention to the facts and circumstances of each particular case,
> including [1] the severity of the crime at issue, [2] whether the suspect
> poses an immediate threat to the safety of the officers or others, and
> [3] whether he is actively resisting arrest or attempting to evade arrest by
> flight.

<u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989) (numbers added).[6] This

"'reasonableness' inquiry . . . is an objective one: the question is whether the

officers' actions are 'objectively reasonable' in light of the facts and circumstances

---

[5] Although the district court, in granting Deputy Jenkins qualified immunity, did not
address this first inquiry, we can affirm on any ground supported by the record. <u>See</u>
<u>Culver v. Armstrong</u>, 832 F.3d 1213, 1214–15 (10th Cir. 2016). Further, the parties
addressed both qualified immunity inquiries in the district court and in their briefs to
us. <u>See</u> <u>Carabajal v. City of Cheyenne</u>, 847 F.3d 1203, 1213 (10th Cir. 2017).

[6] The Tenth Circuit has noted that, "[a]lthough the first and third [<u>Graham</u>] factors can
be particularly significant in a specific case, the second factor—whether there is an
immediate threat to safety—'is undoubtedly the <u>most important</u> . . . factor in determining
the objective reasonableness of an officer's use of force.'" <u>Est. of Taylor</u>, 16 F.4th at 763
(quoting <u>Est. of Valverde ex rel. Padilla v. Dodge</u>, 967 F.3d 1049, 1060–61 (10th Cir.
2020)).

confronting them, without regard to their underlying intent or motivation." Id. at

397.  "The 'reasonableness' of a particular use of force must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight." Id. at 396.

"Fourth Amendment jurisprudence has long recognized that the right to make

an arrest or investigatory stop necessarily carries with it the right to use some degree

of physical coercion or threat thereof to effect it." Id.

> "Not every push or shove, even if it may later seem unnecessary in the
> peace of a judge's chambers," . . . violates the Fourth Amendment. The
> calculus of reasonableness must embody allowance for the fact that police
> officers are often forced to make split-second judgments—in
> circumstances that are tense, uncertain, and rapidly evolving—about the
> amount of force that is necessary in a particular situation.

Id. at 396–97.

Furthermore, "'once a motor vehicle has been lawfully detained for a traffic

violation,'" as was the case here, "'police officers may order the driver to get out of the

vehicle without violating the Fourth Amendmen[t],' . . . because the government's

'legitimate and weighty' interest in officer safety outweighs the 'de minimis' additional

intrusion of requiring a driver, already lawfully stopped, to exit the vehicle." Arizona v.

Johnson, 555 U.S. 323, 331 (2009) (quoting Pennsylvania v. Mimms, 434 U.S. 106, 110–

11 (1977) (per curiam)).  And given that officers can order drivers to exit their vehicles, it

necessarily follows that they can use reasonable force to execute those orders.

Otherwise, the power to order the driver to exit the vehicle would be hollow.  Graham,

490 U.S. at 396.

13

### b. The Tenth Circuit's application of <u>Graham</u> to circumstances similar to those presented in this case

The Tenth Circuit has previously applied the <u>Graham</u> factors to circumstances that are similar, but of course not identical, to the facts presented here. In <u>Mecham v. Frazier</u>, 500 F.3d 1200 (10th Cir. 2007), the Tenth Circuit upheld the use of some force to remove a recalcitrant motorist from her car during a traffic stop. <u>Id.</u> at 1204–05. There, a Utah state trooper, at midday, pulled Lemanda Mecham over on Interstate 15 for speeding and failing to wear her seatbelt. <u>Id.</u> at 1202. After discovering that Mecham did not have a valid driver's license, the trooper informed her that he would have to impound her car unless Mecham could arrange for someone to pick it up. <u>Id.</u> At that point, Mecham answered a cell phone call from her mother and refused to put the phone down so the trooper could explain the citation he was issuing Meacham. <u>Id.</u> Although the trooper told Mecham that he would arrest her unless she cooperated, Mecham continued talking on the phone. <u>Id.</u> The trooper then called for a tow truck. <u>Id.</u> When it arrived, fifteen minutes later, the trooper told Mecham that he was impounding the car and she needed to get out of the vehicle. <u>Id.</u> Mecham refused, stating that she was going to wait for her mother to arrive. <u>Id.</u> The trooper then called for backup. <u>Id.</u> After telling the backup trooper that he was going to arrest Mecham for being uncooperative and refusing to get out of the car, Trooper

> Frazier approached Mecham's car from the driver's side while Johnson [the backup trooper] approached from the passenger's side. Frazier told Mecham to get out of the car or he would have to physically remove her, but she again refused. Frazier then sprayed Mecham in the face with

14

> pepper spray, opened the driver's side door, and physically removed her
> from the car. Johnson and Frazier pulled Mecham to the rear of the car,
> put her on the ground, and handcuffed her. Frazier then called for medical
> assistance.

Id. at 1203.

Applying the three Graham factors and focusing in particular on the second

and third factors—"the suspect's resistance and safety concerns"—the Tenth Circuit

held that the use of this degree of force was justified.  Id. at 1204.  Among other

facts, this court noted that Mecham had been uncooperative throughout the stop, had

disregarded the trooper's commands numerous times, and "[d]uring this encounter,

she remained in the driver's seat with the keys in the car, exercising control of the car

at all times."  Id. at 1205.  Concluding that, "[i]n these circumstances, it was a

foregone conclusion that the officers would have to use force to make the arrest," this

court stated:

> Mecham's disregard for the officers' instructions, the length of the
> encounter [fifty minutes], and the implausibility of Mecham's rationale
> for not cooperating [that she doubted Trooper Frazier was a real police
> officer], lead us to conclude that the officers' use of force was justified
> in these circumstances.
>
> With the benefit of hindsight, one might have hoped for a different
> resolution. But "[n]ot every push or shove, even if it may later seem
> unnecessary in the peace of a judge's chambers, violates the Fourth
> Amendment." Graham, 490 U.S. at 396. In making an arrest, officers may
> inevitably "use some degree of physical coercion or threat thereof to
> effect it." Id. The force used here, while unfortunate, was not excessive.

Id. at 1205 (footnote omitted); see also Simpson v. Kansas, 593 F. App'x 790, 796–

97 (10th Cir. 2014) (unpublished) (upholding the degree of force used to remove

motorist charged with a seatbelt violation who refused to exit her vehicle, which was

stopped on a busy highway on-ramp; in that case, the officer pulled the driver from

car, threw her on ground, and put his knee on her back).

In Davis v. Clifford, 825 F.3d 1131 (10th Cir. 2016), on the other hand, this

court held that the degree of force used to remove a motorist from her car was

excessive.  Id. at 1133.  In that case, a police officer pulled over LaTonya Davis late

at night because she had "an active warrant for her arrest for driving with a

suspended license caused by failure to provide proof of insurance."  Id. at 1133–34.

Davis's car had a handicapped symbol on its license plate.  Id. at 1133.  In response

to the officer's turning on his emergency lights, Davis pulled into a parking lot and

turned off her car engine.  Id. at 1134.  She was soon surrounded by four police cars

"blocking Davis' vehicle from all directions."  Id.

> After being surrounded by police cars, Davis heard batons banging
> on her car and, fearing for her safety, she locked the doors and rolled up
> her window. [Defendant police officers] Clifford and Fahlsing
> approached the driver's side door, and Clifford told Davis to step out of
> the car. Through a gap in the window, Davis asked why she had been
> pulled over and offered to show her license, insurance, and registration.
> Clifford responded, "you know why," and commanded her to "step the
> fuck out of the car." After the officers told Davis that she was under arrest
> and again directed her to exit the vehicle, Davis responded that she would
> get out of the car if the officers promised not to hurt her.

> When Davis did not immediately exit her vehicle, [Officer]
> Fahlsing shattered the driver's side window with his baton. Instead of
> reaching in to open the door, [Officers] Clifford and Fahlsing grabbed
> Davis by her hair and arms, pulled her through the shattered window,
> pinned her face-down on the broken glass outside the car, and handcuffed
> her.

Id.

16

The Tenth Circuit held that Davis had adequately supported an excessive force claim against the two officers sufficient to survive summary judgment.  Id. at 1135–36.  In reaching that conclusion, this court ruled that all three Graham factors weighed against the degree of force the officers used to remove Davis from her car.  Id.  The first Graham factor—the severity of the offense—"weigh[ed] heavily against" the officers because "'[a] minor offense—at most—support[s] the use of minimal force.'"  Id. at 1135 (quoting Perea v. Baca, 817 F.3d 1198, 1203 (10th Cir. 2016)).

"The second factor, whether Davis posed an immediate threat to the safety of the officers or others, also weigh[ed]" against the officers.  Id.

> There is no evidence that Davis had access to a weapon or that she threatened harm to herself or others. . . . To the contrary, Davis alleges she merely sought reassurance that she would not be hurt, and that the officers responded by shattering her vehicle window and pulling her through the broken window by her hair and arms.

Id.

> The third factor, whether Davis actively resisted or attempted to evade arrest, weighs slightly against [the officers]. That Davis rolled up her window, left her keys in the ignition, and refused to exit the vehicle when ordered to do so could suggest that she was attempting to resist or evade arrest.  Cf. Mecham v. Frazier, 500 F.3d 1200, 1204–05 (10th Cir. 2007) (holding that officers were justified in using pepper spray on a driver during a fifty-minute stop for speeding, in part, because she had the keys and control of her car and refused to cooperate). However, because police cars surrounded Davis' car on all sides, she could not have driven away. Moreover, there is no evidence that Davis actually attempted to flee. In addition, Davis' car had a license plate with a handicapped symbol. Because Davis was not actively resisting arrest or attempting to flee, even though she did not immediately obey the officers' orders, this factor weighs less heavily against [the officers].

Id. at 1136.

Davis distinguished the facts at issue in that case from those addressed in our unpublished decision in Valencia v. De Luca, where this court upheld the degree of force used by several officers to pull a non-compliant juvenile driver from his car, see 612 F. App'x 512, 518–19 (10th Cir. 2015) (unpublished).  In doing so, this court noted that, while Davis "is handicapped and was not actively resisting arrest," the juvenile driver in Valencia "was actively resisting arrest by bracing his legs against the floorboard and grabbing onto the steering wheel."  Davis, 825 F.3d at 1136 n.2; see Valencia, 612 F. App'x at 515, 518–19.  In Valencia, this court specifically upheld the officers' conduct in "pulling on" the teenaged driver, "using pressure points, and twisting his wrist and arm" to get him out of the vehicle, noting that that amount of force "was no greater than the force we considered reasonable in Mecham."  612 F. App'x at 519.

## 2.  Applying this Fourth Amendment law to Helvie's case

The Tenth Circuit cases just discussed, applying the three Graham factors to situations where officers physically removed a recalcitrant motorist from his or her vehicle, provide a framework for our analysis of whether the force Deputy Jenkins used against Helvie was reasonable.  We analyze the force Deputy Jenkins used against Helvie by applying the Graham factors twice—once to the circumstances before the deputy saw the gun in Helvie's driver's door pocket and a second time to

the circumstances after the deputy saw the gun while dragging Helvie from the truck.[7]

### a. Prior to Deputy Jenkins seeing the gun

Summarizing the Fourth Amendment law relevant here, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. During a traffic stop, an officer can order a motorist out of his vehicle. See Johnson, 555 U.S. at 331. In Mecham, we upheld the use of some force to pull from her car an uncooperative motorist who refused to get out of her vehicle. See 500 F.3d at 1204–05. In light of this law and applying the Graham factors to the circumstances presented here, we reject Helvie's contention that Deputy Jenkins used too much force to pull him from his truck.

The parties agree that the first Graham factor—the severity of the crime at issue—initially weighs against the use of more than minimal force. See Davis, 825 F.3d at 1135. That includes the minimal force ordinarily needed to accomplish the task of removing a motorist from his vehicle. See id. But here, Helvie quickly

---

[7] We recognize, of course, that this entire incident occurred in a short few moments. But, as is often the case, the undisputed facts at issue here illustrate that the circumstances Deputy Jenkins faced were quickly evolving, and those evolving facts are relevant to our assessing the reasonableness of the force used against Helvie throughout the seizure process. See generally Graham, 490 U.S. at 396–97 (noting that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation").

escalated the situation, requiring the deputy to use some additional force to overcome Helvie's resistance to being removed from his truck.  Deputy Jenkins was, thus, justified in using Helvie's leg to drag him out of his truck after Helvie pulled his arm away from the deputy's grip and leaned into his truck to try to avoid being pulled out of his vehicle.  Cf. Valencia, 612 F. App'x at 515, 518–19 (upholding force used by several officers to remove uncooperative driver, including pulling on the driver, using pressure points and twisting his wrist and arm, where driver was trying to avoid being removed from his vehicle by "bracing his legs against the floorboard and grabbing onto the steering wheel").  This first Graham factor, therefore, supports the level of force Deputy Jenkins used to remove Helvie from his truck.

So, too, does the second Graham factor—whether Helvie posed an immediate threat to the safety of the deputy or others before the deputy saw the gun.  Deputy Jenkins was alone, had stopped Helvie late at night, and there were two other people and a large dog in Helvie's truck.  Helvie refused to get out of his truck when the deputy lawfully ordered him out.  Adding to these safety concerns, an objective officer in Deputy Jenkins's position could have suspected Helvie of driving while impaired, thus presenting a possible danger to the public if he were to flee and also suggesting that Helvie might have been acting with impaired judgment which might lead him to try to flee.  Helvie would have needed simply to push a button to restart his truck and, unlike the plaintiff in Davis, Helvie's path was not blocked by any police car.  These circumstances raise sufficient safety concerns to support Deputy

20

Jenkins pulling Helvie out of his truck. This factor, consequently, also supports Deputy Jenkins' conduct.

The third Graham factor—whether Helvie was actively resisting arrest or attempting to evade arrest by flight—also weighs in favor of the force the deputy used to pull Helvie from his truck. On appeal, Helvie asserts, in a conclusory manner, that he was not resisting. But in Davis, this court noted that the fact "[t]hat Davis rolled up her window, left her keys in the ignition, and refused to exit the vehicle when ordered to do so could suggest that she was attempting to resist or evade arrest." 825 F.3d at 1136. There is no dispute that Helvie acted similarly here. Helvie actually went further than Davis in trying to avoid arrest. As in Valencia, where the teenaged motorist "brac[ed] his legs against the floorboard and grabb[ed] onto the steering wheel" to avoid being pulled from his vehicle, 612 F. App'x at 515, here Helvie tried to avoid being pulled out of his truck by yanking his arm away from Deputy Jenkins and leaning deeper into the truck. Helvie's efforts to resist arrest further support Deputy Jenkins's decision to pull Helvie from his truck.

All three Graham factors, then, support the degree of force initially used by Deputy Jenkins to get Helvie out of his vehicle.

### b. After Deputy Jenkins saw the gun in the driver's door pocket

Accepting the fact that Deputy Jenkins saw the gun in the driver's door pocket as he was pulling Helvie from his truck, the Graham factors further support the deputy dragging the uncooperative Helvie toward the back of his truck, away from

the gun, and placing his knee on Helvie's chest to gain control of him, and to
handcuff him.

The first <u>Graham</u> factor—the severity of the offenses at issue—still supports
the use of only minimal force. But Helvie's resistance to Deputy Jenkins's lawful
order to exit his truck supported the deputy's use of the degree of force needed to
effect his order.

The second <u>Graham</u> factor—whether Helvie posed an immediate threat to the
officer or others—at this point more strongly weighs in Deputy Jenkins's favor after
the deputy saw there was a gun within reach of the uncooperative Helvie. Moreover,
the deputy, in pulling Helvie from the truck, only had hold of Helvie's leg; his arms
remained unconstrained. This factor, too, supports the deputy's use of force to
remove Helvie from where he could reach the gun and ultimately to subdue Helvie.

The third <u>Graham</u> factor—whether Helvie was resisting arrest—further
supports Deputy Jenkins's using the force he did to move Helvie away from the gun
and then subdue him. Based on these factors, therefore, we conclude that it was
reasonable for Deputy Jenkins both to drag Helvie toward the back of his truck and
then to place his knee on Helvie's chest to subdue and handcuff him. <u>Cf.</u> <u>Mecham</u>,
500 F.3d at 1203–05 (upholding force used to remove uncooperative but <u>unarmed</u>
motorist from her car where that force included pepper-spraying motorist before
pulling motorist her from the car and toward the rear of the vehicle, and there
handcuffing her); <u>Simpson</u>, 593 F. App'x at 796–97 (upholding force used to remove

uncooperative but <u>unarmed</u> motorist, where force included pulling motorist from her vehicle, throwing her on the ground, and putting knee to her back).

In sum, because Helvie failed to establish that Deputy Jenkins used an unreasonable amount of force to remove Helvie from his truck, either before or after the deputy saw the gun, Deputy Jenkins is entitled to qualified immunity.

## C.  Helvie has also failed to establish that Deputy Jenkins violated law that was clearly established in August 2018

For the sake of thoroughness, we briefly address the second qualified immunity inquiry.  Doing so, we state the obvious consequence of our conclusion that Deputy Jenkins did not violate the Fourth Amendment: Deputy Jenkins did not violate Helvie's clearly established constitutional rights.

"A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  <u>Rivas-Villegas v. Cortesluna</u>, 142 S. Ct. 4, 7 (2021) (quoting <u>Mullenix v. Luna</u>, 577 U.S. 7, 11 (2015) (per curiam)).  To show that a constitutional violation was clearly established at the time it occurred, "the plaintiff must point to Supreme Court or Tenth Circuit precedents [o]n point, or to the clear weight of authority from other circuit courts."  <u>Thompson v. Ragland</u>, 23 F.4th 1252, 1255 (10th Cir. 2022).

Here, before the district court, Helvie relied on Tenth Circuit case law indicating that a "clear" violation of <u>Graham</u>—that is, "'no substantial grounds for a reasonable officer to conclude that there was legitimate justification' for acting as they did"—may be deemed a clearly established Fourth Amendment violation under

Graham.  (Aplt. App. at 98 (quoting <u>Casey v. City of Fed. Heights</u>, 509 F.3d 1278,

1286 (10th Cir. 2007).)  The Supreme Court has similarly indicated that, "in an

obvious case, [<u>Graham</u>'s] standards can 'clearly establish'" a Fourth Amendment

violation, "even without a body of relevant case law."  <u>Rivas-Villegas</u>, 142 S. Ct. at 8

(quoting <u>Brosseau v. Haugen</u>, 543 U.S. 194, 199 (2004)).  But "this is not one of the 'rare

and obvious cases' where the degree of force rises to a level justifying reliance on

<u>Graham</u> itself to clearly establish the law."  <u>Surat v. Klamser</u>, 52 F.4th 1261, 1280 (10th

Cir. 2022) (quoting <u>Davis</u>, 825 F.3d at 1137).

   <u>Davis</u> was one of those "rare and obvious" cases, but it is quite dissimilar to the

case before us.  <u>See</u> 825 F.3d at 1136–37.  There, we found "nothing in the record that

would justify the alleged aggressive behavior of the officers," <u>id.</u> at 1136—behavior

which included breaking the window of a car that was completely surrounded by police

cars and pulling the unarmed, disabled, and non-threatening driver out of the car by her

arms and hair, through the broken window and then slamming her to the ground amidst

the broken glass, <u>see</u> <u>id.</u> at 1133–34 & 1136 n.2.  Furthermore, unlike Helvie here, the

motorist in <u>Davis</u> did not completely refuse to get out of her car but instead only sought

assurances from officers that they would not hurt her.  <u>Id.</u> at 1133–34.  Also unlike

Helvie, the driver in <u>Davis</u> did not have access to a gun.  Under those more egregious and

"disturbing" circumstances in <u>Davis</u>, we held that "we need not have decided a case

involving similar facts in order to say that no reasonable officer could believe that he was

entitled to behave as [the defendant officers in <u>Davis</u>] allegedly did."  <u>Id.</u> at 1136

24

(quoting Casey, 509 F.3d at 1285).  But those circumstances are a far cry from the situation at issue in our case.[8]

Here, instead, "the most analogous . . . precedent favors" upholding the force Deputy Jenkins used against Helvie.  Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018).  Reiterating what we have already stated, the Tenth Circuit, in Mecham, established that during a traffic stop an officer can use force to remove a recalcitrant and uncooperative motorist from her vehicle.  The force justifiably used in Mecham, which involved pepper-spraying the motorist before pulling her out of the vehicle, was arguably greater than the force Deputy Jenkins used to pull Helvie out of his truck.  On the other hand, distinguishing Mecham and Davis, here after pulling Helvie out of his truck, Deputy Jenkins saw the gun in Helvie's driver's door.  At that point, then, the uncooperative Helvie still had potential access to a gun until he was fully subdued.  In light of that, Deputy Jenkins's conduct in dragging Helvie toward the back of his truck and away from the gun was reasonable.  Furthermore, although not determinative, we note that in Rivas-Villegas in 2021—decided several years after Deputy Jenkins stopped Helvie—the Supreme Court held that it was not a clearly established Fourth Amendment violation for an officer to kneel briefly on a

---

[8] For the first time on appeal, Helvie cites to a Fifth Circuit case, Deville v. Marcantel, 567 F.3d 156 (5th Cir. 2009) (per curiam), as clearly establishing a constitutional violation here.  But a single Fifth Circuit case cannot alone clearly establish the law in this circuit.  See Thompson, 23 F.4th at 1255.  In any event, Deville is distinguishable, involving arguably more egregious facts than those at issue here, facts instead along the lines of excessive force used in Davis, see 825 F.3d at 1134.

suspect in order to keep him from reaching a weapon—there, a knife in his front pants pocket.  See 142 S. Ct. at 8–9.

In sum, then, even if we could conclude that Deputy Jenkins used an unreasonable amount of force against Helvie during the traffic stop (and we do not reach that conclusion, as previously explained), any such constitutional violation was not clearly established at the time that the traffic stop at issue here occurred, in August 2018.  Helvie has not pointed us to any relevant case law that would clearly establish a Fourth Amendment violation under the circumstances presented here.  Nor have we found such a case.

## IV. CONCLUSION

The district court properly determined that Deputy Jenkins saw the gun in Helvie's driver's door pocket as the deputy was pulling Helvie out of his truck. Accepting that fact as true, Helvie has failed to show that Deputy Jenkins used an unreasonable amount of force against Helvie at any time during the traffic stop. Furthermore, Helvie has not pointed to any relevant cases, and we cannot find any, indicating that his asserted constitutional violation was clearly established in August 2018.  We, therefore, AFFIRM the district court's decision to grant Deputy Jenkins qualified immunity.